UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
'01 MAR -7 PM 1:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

VICQUILLA GARTH         )
                        )
    Plaintiff,          )
                        )
vs.                     )   Civil Action No: CV-99-S-1687-NE
                        )
WILLIAM P. ROBINSON,    )
                        )   ENTERED
    Defendant.          )
                            MAR -7 2001

## MEMORANDUM OPINION

Plaintiff, Vicquilla Garth, alleges that defendant, William P. Robinson, unlawfully seized, and applied excessive force to her person when she refused to relinquish a bleacher seat during a high school basketball tournament. She seeks monetary redress for Robinson's actions under 42 U.S.C. § 1983 and the state law tort of battery. Plaintiff originally sued Robinson, the City of Decatur, Alabama, and the Decatur City Board of Education, but her claims against the city and board were dismissed (doc. no. 8). Robinson's amended motion to dismiss, asserting the affirmative defense of qualified immunity (doc. no. 13), was denied on December 3, 1999 (doc. nos. 23 & 24).

The action now is before the court on defendant's motion for summary judgement (doc. no. 30). Upon consideration of the motion, pleadings, briefs, and evidentiary submissions, this court finds the motion is due to be denied.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally id.*; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d

590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537

(11th Cir. 1988), conclusory, see *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable jury could draw more than one inference from the evidence, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. See *Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTS

Plaintiff attended a basketball tournament at Brookhaven Middle School in Decatur, Alabama, on February 6, 1998. Her daughter was a cheerleader for the Brookhaven basketball team.[1] Plaintiff was accompanied by her niece (Caia) and cousin (Tameeka).[2] They arrived at approximately 5:30 o'clock p.m. Three basketball games were to be played that evening. The gymnasium accordingly was crowded and seating was limited. When plaintiff's party entered, they were unable to find seats.[3] Eventually, a man in the front row of one section of bleachers offered his seat to plaintiff, and she sat down.[4] Two additional seats were available nearby. Plaintiff's cousin Tameeka sat to her left, and her niece Caia sat to her right.[5] Next to Tameeka, to plaintiff's left, sat two young white boys who frequently were away from their seats.[6]

---

[1] Plaintiff's evidentiary submission in opposition to summary judgment (doc. no. 37) at 24-25.

[2] *Id.* at 28. The record does not reflect the last names of plaintiff's niece and cousin.

[3] *Id.* at 80.

[4] *Id.*

[5] *Id.* at 26.

[6] Plaintiff described the boys' behavior:

"And her [defendant's wife's] kids were setting [sic] next to my cousin and they was playing up and down, up and down. They really wasn't sitting down on the seats for a long period of time. And they was just up and down, you know, just setting and playing."

*Id.* at 27.

5

Next to Caia, to plaintiff's right, sat two other young men who, like plaintiff, were American citizens of African ancestry.

Soon after plaintiff's party settled into their seats, a woman in the second row, seated behind Tameeka, tapped plaintiff on the shoulder and asked her to move farther down the row.[7] The woman, who identified herself as the mother of the two white boys seated next to Tameeka, told plaintiff that her children did not have enough room.[8] Plaintiff told the woman that she was unable to move down, because the two boys sitting next to Caia would be "knocked ... off the seat."[9] The woman repeatedly asked plaintiff to move down, and plaintiff repeatedly refused.[10] The exchange lasted for approximately ten minutes.[11] After that, plaintiff thought "it was over with," and that she was "through with it."[12] Only later did plaintiff learn that the woman was defendant's wife, and that the young boys sitting next to her cousin Tameeka were defendant's children.

Meanwhile, another young male of African ancestry attempted to sit in an empty seat on the other side of defendant's wife. She

---

[7] *Id.* at 26.
[8] *Id.* at 27.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.* at 28.

told the young man he could not sit there, but another woman who was sitting farther down the second row (plaintiff's acquaintance Paula Williams), told him that he <u>could</u> sit there. Paula Williams and defendant's wife then "had words."[13] The young man sat down momentarily, but obviously thought better of it, because he vacated the seat.[14]

At halftime, plaintiff's cousin Tameeka left the tournament. Caia's boyfriend Melvin arrived and sat next to Caia. The two young white boys who had been sitting next to Caia previously had walked out of the gym. Defendant's wife also left the gymnasium. Paula Willams then sat down next to plaintiff, in the seat formerly occupied by Tameeka, and engaged plaintiff in conversation. While plaintiff and Williams were talking, defendant's wife re-entered the gym. Seeing Williams next to plaintiff, defendant's wife "just made a U-turn and went back out."[15]

At that point, defendant Robinson entered the gymnasium. Robinson was an off-duty City police officer who had been hired by the school system to provide security at the basketball tournament. He approached the edge of the bleachers in which plaintiff was

---

[13] *Id.* at 29.
[14] *Id.* at 31. The woman said something to the boy that convinced him to move. *Id.*
[15] *Id.* at 32-33.

7

seated and said, "get up."[16] Plaintiff and Williams did not immediately comprehend to whom defendant's statement was directed. Defendant pointed to Williams and repeated his command, "get up."[17] Plaintiff and Williams then realized that defendant was speaking to them. Defendant approached Williams and, for a third time, told her to "get up." He said that he had "set [sic] his boys there."[18] It was only then that plaintiff realized the two boys who had been sitting next to her cousin Tameeka were defendant's children, and, that the woman who had demanded she move down the row of seats was the defendant's wife. Defendant reiterated that Williams was sitting in his boys' seats. Plaintiff interrupted, and told defendant that his sons had not been using their seats. Defendant "came and got down in [plaintiff's] face and told [her] to get out of the ballgame."[19] Plaintiff asked, "Why?" Defendant responded to her question only by repeatedly commanding that she "get out of the game."[20] Plaintiff did not move. She continued sitting in the seat and held onto it. Defendant then grabbed plaintiff's left arm and began pulling on it.[21] He continued to demand that she leave

---

[16] *Id.* at 35.
[17] *Id.*
[18] *Id.* at 36.
[19] *Id.* at 37.
[20] *Id.* at 39.
[21] *Id.* at 40.

the gymnasium. Defendant removed his jacket and gave it to his wife. Plaintiff told him that she was not leaving, that she "was like Rosa Parks," and that she "was not moving off that seat."[22] Plaintiff's niece Caia stood and said, "Come on, Vickie, let's just go."[23] Plaintiff then stood up and began putting on her coat. Defendant nevertheless "jerked" plaintiff's arm once again, and told her that she was not moving fast enough for him.[24] Plaintiff drew back her right arm, in preparation for striking defendant,[25] but Williams grabbed her arm and said, "Don't do that!"[26] Defendant released his grip on plaintiff's other arm, and she began walking out of the gymnasium with Caia and Paula Williams. As they were doing so, another city police officer ran into the gym. He asked what had occurred, and plaintiff explained the situation. Plaintiff, Caia, Williams, and the second police officer walked out of the gymnasium together. He apologized to plaintiff for not being inside the gymnasium during the confrontation, and said that he did not understand why defendant had asked her to leave.[27] Defendant was standing nearby. He was "fixing to say something,"

---

[22] *Id.* at 41.
[23] *Id.*
[24] *Id.*
[25] *Id.* at 42.
[26] *Id.*
[27] *Id.* at 44.

9

but plaintiff "told him [she] didn't want to hear anything else from him."[28] The second officer told plaintiff that she could return to the game.[29] Plaintiff, Caia, and Williams re-entered the gymnasium. They stood inside for a period of time, then found seats in the bleachers in a higher location.[30] Following the incident, defendant continued to look at plaintiff during the remainder of the game.

After the game, plaintiff, her daughter, and Paula Williams drove to City Hall.[31] Plaintiff told an on-duty police officer that she wanted to file a complaint, and related the incident with defendant. The officer asked plaintiff whether she had been hurt. Plaintiff said that her arm *was* hurting. Plaintiff, who was wearing a long sleeved blouse, went to a private room to inspect her arm. She found it "was just bruised up."[32] The officer took photographs.

The next morning, plaintiff visited the emergency room, complaining that her left shoulder and arm were bruised and hurting.[33] She was given a prescription and her arm was x-rayed. Plaintiff later visited her family physician, Dr. Redding, who

---

[28] *Id.* at 45.
[29] *Id.* at 45.
[30] *Id.* at 46.
[31] *Id.* at 48.
[32] *Id.* at 51.
[33] *Id.* at 53-54.

10

referred her to a physical therapist. She attended therapy three times a week for two weeks.[34]

### III. DISCUSSION

**A.   Qualified Immunity Under 42 U.S.C. § 1983**

Section 1983 imposes liability upon those persons who, while acting under color of state law, deprive an individual of rights secured by the Constitution and laws of the United States.[35] Even so, state and local law enforcement officers may raise the affirmative defense of qualified immunity. The Supreme Court articulated the standard for determining whether an official is entitled to qualified immunity in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), saying:

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738; *see also, e.g., Jackson v. Sauls*,

---

[34]*Id.* at 57.
[35]42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or caused to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

206 F.3d 1156, 1164 (11th Cir. 2000).

Defendant previously asked this court to dismiss plaintiff's action in 1999, asserting the defense of qualified immunity.[36] This court denied defendant's motion, finding that his conduct, as described by plaintiff, violated her Fourth Amendment right to be free from an unreasonable seizure.[37] This court further found that the Fourth Amendment violation was readily apparent from defendant's allegedly unlawful conduct.[38]

Defendant again argues that he is entitled to qualified immunity. He contends that he was acting within his discretion, and that his actions did not violate clearly established law. In support of his argument, defendant asserts that he followed the "force" directives prescribed by the City of Decatur Police Department. He also cites numerous decisions issued by the courts of the State of Alabama. He relies most heavily upon *Ex parte Cranman*, No. 1971903, 2000 WL 1728367 (Ala. Nov. 22, 2000), which elaborated upon Alabama state-agent immunity. Defendant apparently does not comprehend that the determination of immunity as a defense to an action bottomed upon 42 U.S.C. § 1983 is entirely a question of federal law. *See, e.g., Wood v. Strickland*, 420 U.S. 308, 316-

---

[36]Defendant's motion to dismiss (doc. no. 2).
[37]Memorandum opinion entered December 3, 1999 (doc. no. 23) at 3-7.
[38]*Id.* at 7-9.

19, 95 S.Ct. 992, 998-99, 43 L.Ed.2d 214 (1975). State immunities and defenses are irrelevant. *See Howlett v. Rose*, 496 U.S. 356, 372, 110 S.Ct. 2430, 2440, 110 L.Ed.2d 332 (1990). The state cases cited by defendant therefore are neither applicable nor helpful when determining whether he is entitled to qualified immunity for the purposes of § 1983 liability.

This court previously addressed defendant's asserted defense of qualified immunity, and found that his conduct, as alleged by plaintiff, is not protected. Because defendant's current argument is substantially similar to the argument the court addressed in 1999, when considering defendant's motion to dismiss, the court finds it unnecessary to revisit the same issues. Therefore, defendant's motion for summary judgment is due to be denied, because of the existence of genuine issues of material facts: *i.e.*, whether defendant engaged in the conduct of which plaintiff complains.

**B.   Immunity Under Alabama Tort Law**

Plaintiff also asserts a state law claim for battery. The tort of assault is defined in Alabama as

> an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.

13

*Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990) (citations and internal quotation marks omitted). "A successful assault becomes a battery, which consists of the touching of another in a hostile manner." *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995) (citing *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala. 1986)). "The wrong 'consists, not in the touching, so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting damages.'" *Portera v. Winn Dixie of Montgomery Inc.*, 966 F. Supp. 1418, 1437 (M.D. Ala. 1998) (quoting *Surrency*, 489 So.2d at 1104).

Although immunities created by state law are not pertinent to federal statutory claims, they may protect state officers from liability under state causes of action. In Alabama, a person who acts as an agent of the state is entitled to invoke the state's sovereign immunity if the act complained of was committed while that person was performing a discretionary function. *Carroll v. Hammett*, 744 So. 2d 906, 910 (Ala. 1999). The Alabama Supreme Court recently elucidated the doctrine of state-agent immunity in *Ex parte Cranman*, No. 1971903, 2000 WL 1728367 (Ala. Nov. 22, 2000). In applying qualified immunity, Alabama courts have drawn the line between discretionary acts and those that are purely

14

ministerial. *Id.* at *9. Simply stated, "conduct related to policy and planning and involving the exercise of judgment carries immunity, while ministerial acts carrying out the commands of decision-makers do not." *Id.* at *10. Analyzing its prior holdings, the Alabama Supreme Court restated the Alabama rule governing state-agent immunity. It found, in part:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> . . .
>
> 4) exercising judgment in the <u>enforcement of the criminal laws</u> of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
>
> 5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or <u>educating students</u>.

*Id.* at *11 (emphasis supplied). Even so, a state agent's immunity is not absolute.

> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
>
> 1) when the Constitution or laws or the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>
> 2) when the State agent acts willfully, maliciously,

15

>     fraudulently, in bad faith, beyond his or her authority,
>     or under a mistaken interpretation of the law.

*Id.* at *12.

Here, defendant contends that his acts were discretionary, and that he is entitled to invoke the State's immunity as a shield to plaintiff state tort claim. He first argues that he is entitled to immunity in his capacity as an agent of the school board. "[A] person who acts as an agent of a county board of education shares in the State's sovereign immunity if the act complained of was committed while that person was performing a discretionary act." *Carroll*, 744 So. 2d at 910. Defendant further contends that his actions were discretionary and protected, because they occurred in a school setting. "It is well established that the supervision of students is a discretionary function." *Id.* at 911. Nevertheless, defendant is not entitled to immunity as an employee of the school board. Although defendant's acts occurred in a school facility, he was not supervising students. The crux of Alabama's rule is the supervision of students. The location of the activity complained of is irrelevant. *See Faulkner v. Patterson*, 650 So. 2d 873, 875 (Ala. 1984) (supervising students during field trip to ice skating rink is discretionary function). Here, defendant was acting under color of his authority as a city police officer, not as a

supervisor of students. Plaintiff is an adult, not a student. Even though defendant was off-duty, he was wearing his official police uniform. Thus, defendant purported to be acting as a law enforcement officer.

Defendant next contends that he is entitled to discretionary function immunity in his capacity as a police officer. Alabama law provides that police officers are entitled to such immunity under the following circumstances:

> Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a count or municipality thereof, ... and whose duties prescribed by law, or by the lawful terms of their employment or appointed, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, <u>and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties</u>.

Alabama Code § 6-5-338(a) (1975) (emphasis supplied).

The first step in the discretionary function analysis is to determine whether defendant was engaged in the performance of a discretionary function at the time the alleged battery occurred.

17

See *Sheth v. Webster*, 145 F.3d 1231, 1239 (11th Cir. 1998). As discussed *supra*, an officer's acts in furtherance of the criminal laws, including the act of attempting to arrest a person, are characterized as "discretionary." See *Cranman*, 2000 WL 1728367 at *11.

Still, it is not clear at this stage of the proceedings that defendant is entitled to discretionary function immunity. It is not at all clear whether defendant's acts were in furtherance of the criminal laws, or his private (family) interests. Further, immunity does not apply to the extent that an officer's acts violate the Constitution or laws of the United States. See *Id*. at *12. This court has determined that defendant's acts, as alleged by plaintiff, violated her Fourth Amendment right to be free from unreasonable seizure. Thus, the determination of whether defendant engaged in such conduct is a question of fact to be determined by a jury, and summary judgement is due to be denied.

An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this the 7th day of March, 2001.

_____
United States District Judge